Good morning, Your Honors. May it please the Court, I'd like to reserve four minutes for a rebuttal. Could you state your name for the record? Yes. This is James DeSimone. I represent M.A.R., the minor, as well as the mother of Mr. Rivera, who is the decedent in this case. So the District Court erred when it ruled that there were no tribal issues of fact on an excessive force, and I'd like to focus on three areas here. Before you do that, I have one question that goes to our jurisdiction, and that is, it was not 100 percent clear to me that you have foresworn the possibility of a Monel claim in the future. Are you prepared to say that you will not try to revive a Monel claim no matter what? We relinquish that claim. We relinquish that claim. I think that this was, the reply brief was intended to communicate that we relinquish that claim. I'm sorry, I just wanted to clarify. Sneller v. Casas, as long as there's no manipulation here that we're trying to somehow get it back. I don't think that it was taggedly fully thought out with versus without versus with prejudice when those claims were dismissed. But for the record, we are relinquishing those claims, and we will not attempt to reinstate it after this ruling. Okay, thank you. I have a somewhat foundational question that perhaps you can discuss it during your argument, but the district court divided the incident into three separate analyses. The first step, the first part were the kneeing in the back, the pressure down, the second taser, and then the third back to the pressure downward. Was that appropriate, or should the entire event should have been considered as one episode? I think it's appropriate for the analysis, but I do think you have to take into consideration each and every use of force. In other words, when we look at that third analysis where they have someone hobbled and handcuffed prone for two minutes and thirty-five seconds, the officers know what happened before that. It shouldn't be just viewed in isolation. They know that he's been shot with a taser four times and has that electromuscular current. They know that when they first approached him, he's completely unconscious. I think what the court did here was indulge the inferences in favor of the officer's interpretation, in fact, went bent over backwards in some ways. I mean, an illustration of that is the court's... I'm sorry. I was just going to follow up on what Judge Tuna was asking, because part of the analysis is whether the officer's actions were ones that they should have known, that clearly established thought told them they shouldn't do. So, just for the sake of this question, which I think, I hope there is on what Judge Tuna was getting at, let's assume that we were to conclude that the use of the taser was wrong under clearly established law. Do we have to also find that everything else that they did was wrong, or can we just say there's at least one issue of fact and back it goes? You don't have to do that, but I would urge the courts that each... No, but I'm asking you sort of as a theoretical matter. Do we have to find that each thing that they did was wrong, or is it enough to say, just hypothetically here for the moment, that at least one of the actions they took was wrong under clearly established law and that is sufficient? Wouldn't that be sufficient for an issue of fact? Absolutely. And I think that that's why I was going to go to the taser first, because I think that that's the most obvious and part of the... Would it go back in for assessment of the totality of the circumstances, or would it go back only for an assessment of whether the taser implementation was incorrect? I think it depends on how your honors would want to couch that ruling, but I would urge your honors to say that there's tribal issues of fact on each of those three instances that constituted excessive force here. And we know that if we look at the taser itself. You have, in this instance, the Board of Police Commissioners specifically found that Mr. Rivera was not violent and did not pose an immediate threat to those officers. They reviewed the complete record. Now, if you have folks on the Board of Police Commissioners that are making that determination, then a judge sitting in a district court should not be able to say, well, I find there are no tribal issues of fact, because reasonable people found it otherwise, that he was not a threat when that taser was used. And then if we look at the excerpt of record on 634, which is the LAPD's use of less lethal weapon, it specifically states the courts have held that less lethal force are capable of inflicting significant pain and may cause serious injury. So you have in the very policies of the LAPD that they are putting those officers on notice that their policies are not just LAPD trying to make sure that people are safe, which they should, but we are being told this by the courts, that we have to do this, and that you cannot use a taser unless someone is posing a direct threat of violence towards those officers. And when we look at the point in time when the taser is being used and the different factual disputes and the characterizations, I mean, the court starts out its analysis first saying that Mr. Rivera walked down the embankment. There's nothing in the record. The airship said he rolled down the embankment. He gets down there in a matter of seconds, takes the officers 20 to 25 seconds to walk down there. When he's down on that embankment, he's completely unconscious. The court finds that it's finding a fact that he deliberately was ignoring commands to show his hands. Well, if you look at the various areas of the videos, his left hand is up by his head, his right hand is out here. They can see his hands as a little interference, right? It's not just what you can see on that body cam at a point in time. It's what the officers can see. They have officers up on the ridge providing cover. And so in the cases where you have a rapidly evolving situation where tasers have been held, that the law is not clearly established, you have someone who is actively fighting with one officer. The AB case that the court ruled on, that I believe you were on that panel, Judge Graber, in that instance you have civilians all around. You have an individual who is fighting one officer and actively fighting an officer when the taser is used. Contrast that with the Rivera case where he's prone the entire time. He's face down. You have multiple officers. They never lose control of the limb. The court finds... The officers when they arrived had been told that he was a burglary suspect. Burglary can be a violent crime, and the judge seemed to take that into account. Could you address that issue for a moment, what their knowledge was when they arrived at the scene? Well, it can be a violent crime, but in this instance, you basically have someone who's trying to get into doors, seeing if they're locked or unlocked, and then moving on when he wasn't able to. So there was no crime of violence. There was no... Attempted burglary at best is what you're saying. Correct. And what was also being communicated to the officers is that he's unsteady on his gait. He's not. He looks confused. I mean, this is clearly a person who is under the influence of something, or perhaps having a psychotic episode the officers can't be sure. But the care that should be given to him should be consistent with someone when they find him. And, of course, we have to evaluate in these situations on a moment-by-moment basis. So it's not like he's in the middle of a burglary where people are at risk when they confront him. Let's look at the reality of the situation. This guy's completely unconscious at the bottom of a wash after he tumbled down. And so the court says that he's deliberately ignoring these commands. And, again, that's a factual issue. A reasonable trier of fact would say he wasn't ignoring them, he just didn't hear them because he was unconscious. You only see his eyes open after the officers pounce on him. And I think we've cited the case law with the Jones case and the Bonnevard case that clearly shows that you cannot use repeated shocks. Remember, he just doesn't tase him once, he tase him four times in rapid succession while he's under control. The court also finds that it's Mr. Rivera that is preventing his arms from being moved behind him and putting his arms into a position. Well, it's true that Mr. Rivera clasps his hands behind his head at one point, but the officers actually have both arms. And you have one of the officers kneeling on his bicep, on his right arm. How is he supposed to move his arm behind? And you have another officer who has two handcuffs, and then he's using that second handcuff as leverage to pull his hands behind. You have other officers that are standing there just watching this. This was a man who was under control of LAPD officers and was gratuitously and unnecessarily tased while he was in that helpless position, after he came to after being unconscious. It goes back to the basics. If the force is not necessary, it's not reasonable. And in that instance, you had officers who just could have held down his leg at that point and completed the handcuffs. I want to make sure I understand the record. On the initial pressure that was placed on Mr. Rivera, two officers with a knee on his back with about half their body weight on that knee, and then another officer with an arm on the upper torso putting pressure there. Is that what the record shows? Well, I don't know if you could say that it was half. I would say that it was more than 75% to 90%. If you have your knee on someone and you have your leg stretched out for balance, but your knee is pressing into their back, you're really putting more of the entirety of your weight. So I would not say just because – and the court found that he – I think the question may be more basic than that. Two officers, both with their knees pressing on him, plus one more with an arm on the torso. Is that correct? That's correct, but there was a fourth officer on the other side. So, in other words, you've got – I mean, yes. But you have – but then you have the other officer pressing into the bicep. And I just – I see that it's three minutes and 40 seconds. I just want to get to the position of asphyxiation. There are a number of out-of-circuit cases that have for years shown that there is a consensus, that you just do not put someone on their stomach when they are handcuffed and hobbled. And the court, in order to justify this, says that our client, or the decedent, voluntarily rolled onto his stomach. That's absurd. He's in handcuffs and hobbled. You have an officer holding up the hobble. He didn't voluntarily roll onto his stomach. He stopped moving once he rolled onto his stomach. But those officers, during that two minutes and 35 seconds, are pretty – placing their hands down on him. At one point, their knees onto him. That is totally against policies. And once again, you have the polities, the excited delirium polities, that say once you've put those hobbles on, you must put the person into a seated position or put him on his side if you can't put him in a seated position. They should have sat him up. I didn't hear on the video Mr. Rivera claiming that he couldn't breathe. He was grunting and it sounded like a scream at one point in time. Is that significant, that he didn't say that he couldn't breathe? I don't think so because – and I'll tell you why. During that period of time when he's on his side, before he's placed on his stomach, he's convulsing. In fact, if you listen to Officer Romero, as of yet, he said he was convulsing. He was like a fish out of water. A fish out of water. How is a fish out of water a threat? Very telling. So while he's not saying that he's not breathing, he is indicating by his behavior that he is in medical distress and should have been treated as someone in medical distress. They should have sat him up. His legs are tied, his head behind his back. He's got ten officers around him, no civilian in sight. Why are you putting him on his stomach? And you have the finding of the coroner, and we have Dr. Amala's declaration that showed this was a cause of death. The use of the taser and the positional asphyxiation was a cause of death. And the drum indicates, back from 2003, you can take into consideration that the policy showed that the officers are on clear notice that they violated clearly established law. During Part 3, he was on his side for a period of time. I'm not sure, a minute or something like that. Fifty-five seconds before he was rolled onto his stomach. Did the officers roll him back on his stomach?  I think it's clear that he rolled onto his stomach when the officers were in physical contact with his body. I'm not going to say that they propelled him on his stomach, but they did allow it to happen. But then once he was on his stomach, they pressed down on his back with their hands. And at one point, you have one of the officers yelling on his back, which shows that the pressure is being applied. It's completely inappropriate. You need, at that point, to make sure that you don't kill the guy. And instead, they did the exact opposite of what they're trained to do, and it resulted in a man's death. I have 35 seconds, so I'll reserve that. Very well. We'll round up to two minutes. Thank you very much, Your Honors. Your Honors, Justice Judge Graber anticipated the point where I was going to make, so I would like to see my minute to go to 15. Fair enough. We'll go to 15. Good morning, Your Honors. May it please the Court, my name is Denise Rockowich, and I represent Kelly's officers Bedstrom, Romero, Lopez, and Moser. The crux of the appellant's arguments deal with information that is blatantly contradicted by the record. And a number of his arguments here today are, in fact, blatantly contradicted by the record. First and foremost, counsel stated a couple times that Ravel was completely unconscious at the bottom. Well, he was lying still, and his hands were visible, and they contained no weapons. He was lying still, but he also immediately tensed up and immediately started to actively struggle with the officers as soon as they touched him. He was not unconscious, and that is made obvious by the fact that the second he is touched, he begins to fight with the officers. Also, in terms of- That's a pretty strong word for what appears, at least that's arguable. It's a very active struggle. He does not allow himself to be handcuffed. He is kicking at one point. Immediately prior to the fourth taser application, he kicks the hand of the officer with the taser in his hand. As far as his hands being shown, the officers repeatedly tell him to show his hands, and at one point in the BWC, you can hear an officer saying in English, can you guys see his hand on that side, which would be the left hand, and another officer replies no. So, even the issue of whether or not his hands were empty is belied by the BWC. Well, it may be an issue of fact. I mean, it goes to the officer's knowledge, though. The officers say on the video that they cannot see a hand, and so it can't be an issue of fact in terms of whether or not their force was reasonable, based on the knowledge of the facts that they're perceiving, because they perceived that they couldn't see that left hand. The other thing that counsel raised here was the positional asphyxia, and each of the cases that are cited in the briefing and that were discussed here deal with asphyxia cases. That is, there is no evidence of asphyxia-related death in this case, and indeed, it's contrary to the cause of death, which is not what counsel represented here. I can't quote. I'm not familiar with what the cause of death was here. It's in a sealed record, so I would love to quote from it. I don't know if I am permitted to. Probably not. So, I would urge the court to look at 7ER. Are you challenging the causal relationship? Let me just ask it more broadly. Are you challenging that there is a causal relationship between the pressure that was placed on the decedent's back and other parts of his body and the tasing? In other words, what happened to him and his death? I am not challenging the entirety of that, especially with regard to the tasing was contributing, but there was a specific finding made on 7ER 1377 about asphyxia. It's at the bottom of the page, and that asphyxia was not the cause of death as relayed here today. So, each of those cases, when we're talking about clearly established law and whether or not cases are factually dissimilar, each and every one of them, the Slater case, the Drenham case, the Garlick case, they all dealt with, asphyxia cases, they all dealt with prolonged pressure on a suspect. In some cases, as long as 20 minutes. In the Garlick case, it was 15 minutes. That's not what happened here. We had pressure at varying points on a felony suspect, which is another issue that is repeatedly downplayed both in argument and in the briefing. He was a felony suspect. That may be so, but there's no case that I'm aware of that says that police officers cannot use excessive force on a felony suspect. It has to do with the danger or lack thereof that the person poses in the immediate circumstance, felony suspect or not. And it does depend on whether it's a violent felony. If someone has just killed 14 people, that's one kind of suspect, and this is another. So, I'm not really sure what that adds to the analysis here. What it adds to the analysis is that it is a pronged underground. The severity of the crime is one of the things that has to be taken into account when we're evaluating the uses of force. But we also have to look at the facts in the light most favorable to the plaintiff, do we not? We do, but not under Scott v. Harris when the video blatantly contradicts the plaintiff's position, which it does here. And so, the fact that it was a suspected felony is not the end-all, be-all. However, it's one of the circumstances that has to be taken in consideration. We also have him fleeing, climbing a fence, and going down into the ravine. Then we have him. Well, going down into the ravine is a polite way to put it. He basically, as I understand it, basically fell, stumbled, rolled something, not sort of tidily running down to the bottom, and was, if not unconscious, at least dazed at a minimum. Do you disagree with that? I don't know. The video shows him laying there. I do know that he climbed a fence to get away from the police, though, which is fleeing, which is another element of Graham that has to be considered. Whether or not the suspect fled from police, the cases cited, we're talking about Drummond or the Taser cases, Jones, Bonnevere, those people didn't flee. They didn't resist. That's not what happened here. What weight do we give the administrative findings that this was excessive force, or at least that it was not in conformity with policy? Those are not dispositive. I know counsel may not. Not dispositive, but what amount of weight should we give them? In other words, it seems to me that it goes to their understanding of what their duties were, which is part of a clearly established problem. So in your view, how do we deal with that information? They can be taken into consideration, but they don't establish a constitutional violation as suggested. Even negligent tactics don't establish a violation of the Constitution, which is what we're talking about here. Was the controlling force used against him a violation of the Constitution?  And was the use of the Taser a violation? And those uses of force do need to be looked at separately, because. . . Well, go ahead and finish that point. The point on that is let's assume that this court found that the use of the Taser was unconstitutional. That doesn't mean that the force that came before it is. No, but doesn't it mean it has to be reversed and remanded for trial? If at least one of the types of force used was unconstitutional? As to that use of force and if the law was clearly established at the time, which here it wasn't, because. . . Well, there's Drummond, there's Matos, there are a number of other cases, but I want to be sure I understand your position with respect to this. . . If even one of them involved unconstitutional force and a law that was clearly established, why isn't the answer that the plaintiff gives to go forward with the case? That is correct. If it is unconstitutional and clearly established, then yes, you are correct. It's our position that each of them, the two uses of force, controlling and rolling it to prong, were reasonable as a matter of law. The use of the Taser was not clearly established. The cases that are cited, the Jones case, we've got a misdemeanor traffic stop. Unlike here where there's a felony, you have simultaneous applications of a Taser by multiple officers. We don't have that here. The shots were not isolated shots. They were continuous, repeated, and simultaneous, some lasting as long as 19 seconds. That didn't happen here. Jones was also no longer resisting, which didn't happen here. When you look at the Taser deployments, you have a Taser deployment at 6 ER 1205 at 1245, another at 13, another 15 seconds, later at 1315, another at 1327. The officer then keeps the Taser pressed to Rivera's leg, but no further deployments are made. And at the time of that final deployment, that fourth Tasing, he is very actively resisting. He's struggling with the officers. He had not been restrained. You can hear the clicking of the second set of handcuffs after that fourth Taser deployment, not before. So he hadn't been fully restrained. He's kicking at the Taser, which is being held in the right hand of Moser. And so those other cases where we are talking about a subdued suspect, a restrained suspect, a prolonged Tasing of 20 seconds, that's just not what happened here. And so that can't clearly establish the law with regard to this Tasing. Can I ask you a question? Is there authority precedent for parsing this event into the three separate categories that the district court accomplished by the analysis? I thought that we're really looking at the totality of the circumstances, and even if there is authority for it and we find only one to be a problem, do all three get tried if it's sent back? I think Graham itself is the authority for that, because what Graham tells us that we have to look at the very first prong is the intrusion. Obviously, holding somebody down is a different intrusion than Tasing them, and then that's a different intrusion than, say, shooting them. So when you're looking at uses of force, you have to look at the intrusion as one of the prongs, and then within that you've got the whole circumstances, and you're correct that those circumstances evolve, and maybe a use of force that was reasonable in the beginning could then not be reasonable because of other force prior to it. So it is, I agree, a little bit muddy, but when you look at the uses of force, you have to look at whether that intrusion was constitutional, and I think Graham B. Conner is the authority for that. That's the one that tells us what prongs we have to look at and when. If only one is a problem, do all three get tried? I would say no. Well, how is that possible? If there's qualified immunity, then there's no trial. If there's not qualified immunity, why isn't there just a trial on the whole thing? Because I think it would be the law of the case if the MSG is granted with respect to the controlling force and, you know, the pressure put on the suspect. If we eliminate this asphyxia issue that keeps getting raised, really the only issue in the case is the tasing. And so I don't think that those issues would obviously be discussed, as I was talking about the circumstances, and all of that needs to be taken into account. But whether or not those uses of force were constitutional, I don't think would be an issue anymore because they would either be reasonable as a matter of law or have been granted qualified immunity as not being clearly established. Are you aware of any case in which we have reversed and remanded with that kind of limitation on what happens at trial? I don't think so. I think that would be an evidentiary issue. That would be. Well, no, you're saying it's more than an evidentiary. You're saying that we would have to decide every one of those three things. I couldn't simply say one thing was unconstitutional, go back and try the case. Well, I think every case that we've cited has that. Every case in Fourth Amendment jurisprudence breaks down uses of force and then decides. But have you seen one? I just am not aware of one that has remanded by saying you can't try Issue A or B, but you can try Issues C and D about excessive force. I don't think that would be a position of the Court of Appeal to take. I think the. Well, but that's what you're asking us to do. You're saying go ahead and say that two of these things were reasonable. I mean, you're saying that's one option to say two of these things. They were either entitled to qualified immunity or they were reasonable as a matter of law, and therefore we have a limited trial only on this. You're asking us to do that, and I'm just wondering if you've seen any cases where that's been done. No, I agreed with you previously. That assuming this court finds reasonable reasonable, the tasing was not clearly established or, excuse me, it was either unreasonable or not clearly established, the entire case goes back to the court. Whether or not the district court then allows evidence on issues of the prone restraint or the controlling force, that's an issue that gets dealt with later. If you decide that this was unreasonable or clearly established, yes, the entire case goes back to the district court. I understand your position now. I had one more question, and that is whether this is. . . I could probably have figured this out from the docket, and I apologize that I didn't. Is this a case in which the parties have attempted mediation? And if not, is that something you're willing to do? I would defer to counsel on that. My involvement has been with the appeal and only the appeal, so I'm not entirely sure about that. I would assume so, but I don't know that for sure. Thank you, Your Honor. Thank you very much, counsel. Thank you, Your Honors. I'd like to follow up on a couple of those points. I mean, one, it's a tribal issue of fact as to whether or not this is the use of force that created asphyxiation which led to his death. I mean, the way this works is, and this was explained in front of the whole country in the George Floyd trial with experts. One of them was an LAPD sergeant. But the compressive force causes the difficulty breathing. That leads to cardiac arrest and the cardiopulmonary infarction. Infarction, it's called, not infraction. And then the deprivation of oxygen is what ends up causing a death. And I think in terms of that tribal issue of fact, we have Dr. Amalo's declaration which establishes that really the pressure that was put, and you have to look at the totality of the circumstances, that was eight minutes. And I really do think this was because everybody in that team knew that the taser was being used. This is really an integral participation act where all of the officers can be held liable for the conduct of the whole. And I think that the initial, if you look at the case law and the initial interaction between these officers, when you have someone who's not moving at all, they're immediately digging their knees into his back like that. What you have is an interpretation as Mr. Rivera's actions are consistent with him struggling to survive and live and breathe and not fighting the officers at all. He never hits them. The only thing, in fact, there is a tell when counsel says in order to justify the taser use, he says he's actively resisting.  Well, that's not the standard. The standard under the policies, under the case law, is that he has to be providing a violent threat to those officers. And that's not happening. You could see at one point as the taser is being used, involuntary movement where he kicks his leg back this way. He's not kicking the officers. It's a reflective action to the pain that's being caused by the taser. So you can't tase someone and then have the person react to that taser and then say, oh, well there he's acting violently and that justifies the taser use because now he's moving his leg. Counsel, would you answer the question that I asked opposing counsel, is this a case in which mediation has been attempted? And if not, is that something that you think would be fruitful? I would honestly think that it would not be fruitful without a decision from this court. With my interactions with the city of Los Angeles, I think they need guidance from this court. We just would not ‑‑ I don't see that as being fruitful. Not that we wouldn't be willing to do it, but I just don't think candidly on the city's part that we could have a meaningful mediation without that determination. So I do want to point the ‑‑ You're over, so make it quick. Oh, I'm over. If I'm over, I did a survey of cases in other circuits because I didn't think we had really addressed that adequately in our briefing. Frankly, when I started preparing. And if you look across the board in terms of the notice that the police agencies are giving on positional asphyxiation, my first positional asphyxiation case was as maybe a young lawyer in 1990. I mean, this is not a surprise. Police officers have been trained on this for decades, that when you have someone in hobbles and handcuffs, you sit them up. You don't put them on the stomach. These officers violated those policies when they put him for two and a half minutes on the ground and pressed their hands into it. So I think the taser use is bad. That positional asphyxiation should also be a reversal and even the initial interaction with these officers, where instead of giving him commands as they're getting closer, and that tribal issue of fact, maybe at one point they can't see the hand, but once they come near him, they can see his hand to the left of his head. The fact that he couldn't see it at one point in time is not dispositive. But at that point, you say, hey, put your hands behind your back. We're going to arrest you. Instead of immediately, physically attacking a man who's unconscious, you have a fight-or-flight reaction. His reactions are consistent with someone struggling to survive, and in no way does he ever strike or fight those officers. They're not violent. Is there any public information on the cause of death? There's a coroner's report. That's part of the record. Absolutely, the coroner. Is it sealed? The opposing counsel said that's sealed. I don't think it's sealed. It was provided to us. Well, that doesn't mean it's not sealed from the public. Of course, you would have the opportunity to see it. And we will, too. I mean, we've got the record. It's a matter of whether we can discuss it here in this setting. I understand. Well, we have the Dr. Amalu Declaration that has been filed, not under seal, which would talk about the cause of death. But certainly the coroner's, I could say this, I think the coroner's findings are consistent that the officer's use of force was what was the catalyst causing Mr. Rivera to die that day. All right. Thank you very much, counsel. Thanks to both of you for your briefing argument today. This matter is submitted, and we'll move on to the final case to be argued.
judges: GRABER, OWENS, Tunheim